UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

JANE MARIE PRINCE                    CIVIL ACTION NO. 6:15-cv-1858

VERSUS                               MAGISTRATE JUDGE HANNA

U.S. COMMISSIONER,                   BY CONSENT OF THE PARTIES
SOCIAL SECURITY
ADMINISTRATION

## MEMORANDUM RULING

Before the Court is an appeal of the Commissioner's finding of non-disability.

In accordance with the provisions of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the

parties consented to have this matter resolved by the undersigned Magistrate Judge,

and it was referred to the undersigned Magistrate Judge. (Rec. Doc. 15). Considering

the administrative record, the briefs of the parties, and the applicable law, it is ordered

that the Commissioner's decision be reversed and remanded.

## ADMINISTRATIVE PROCEEDINGS

The claimant, Jane Marie Prince, fully exhausted her administrative remedies

prior to filing this action.  In June 2012, she filed an application for a period of

disability and disability insurance benefits ("DIB")[1] and an application for

supplemental security income benefits ("SSI"),[2] alleging disability beginning on

---

[1]      Rec. Doc. 7-1 at 122.

[2]      Rec. Doc. 7-1 at 126.

February 1, 2012.  Her applications were denied.[3]  The claimant requested a hearing, which was held on February 5, 2014 before Administrative Law Judge Kim Fields.[4] The ALJ issued a decision on February 28, 2014,[5] concluding that the claimant was not disabled within the meaning of the Social Security Act from February 1, 2012 through the date of the decision.  The claimant asked for review of the decision, but the Appeals Council concluded on April 16, 2015 that no basis existed for review of the ALJ's decision.[6]  Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g). The claimant then filed this action seeking review of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

The claimant was born on August 12, 1966.[7]  At the time of the ALJ's decision, she was forty-seven years old.  She has a twelfth grade education[8] and past relevant work experience as a child care provider in a day care center and as a teacher's aid

---

[3]     Rec. Doc. 7-1 at 46, 47.

[4]     The hearing transcript is found at Rec. Doc. 7-1 at 34-45.

[5]     Rec. Doc. 7-1 at 19-27.

[6]     Rec. Doc. 7-1 at 5.

[7]     Rec. Doc. 7-1 at 35.

[8]     Rec. Doc. 7-1 at 36.

in a public elementary school.[9]  She continued to work at Jen's Infants and Toddlers in Opelousas, Louisiana, through April 27, 2012, approximately three months after her alleged disability onset date.[10]  The claimant does not dispute the finding that she worked at a substantial gainful activity level through April 27, 2012.[11]  In her applications, she alleged that she has been disabled since February 1, 2012[12] due to throat cancer, arthritis, and diabetes.[13]

The claimant was seen in the emergency department of University Medical Center ("UMC") in Lafayette, Louisiana, on April 13, 2012, with complaints of bilateral jaw swelling.[14]  On April 27, 2012, a CT scan of the soft tissues of the neck showed lymphadenopathy to the jaw or bilateral parotid gland enlargement.  The claimant was seen at the ear, nose, and throat ("ENT") clinic at UMC on May 3, 2012.[15]  The right parotid gland was aspirated but insufficient material for diagnostic

---

[9]        Rec. Doc. 7-1 at 152, 166.

[10]       Rec. Doc. 7-1 at 181-188.

[11]       Rec. Doc. 12 at 1 n. 2.

[12]       Rec. Doc. 7-1 at 122, 126.

[13]       Rec. Doc. 7-1 at 151.  This Court found no cancer diagnosis in the record, and Single Decision Maker Jennifer Spring confirmed with the claimant's family that, at least as of October 31, 2012, there was no throat cancer diagnosis.  Rec. Doc. 7-1 at 62.

[14]       Rec. Doc. 7-1 at 391-392.

[15]       Rec. Doc. 7-1 at 388-389.

study was gathered.[16]  The claimant followed up at UMC on May 8, 2012, and she was referred to the surgery department.[17]

On May 16, 2012, the claimant was seen at UMC's emergency department.[18] Her mother had found her sweaty, confused, and with a very low blood sugar number. She was diagnosed with dehydration.

The next day, May 17, 2012, she was seen at UMC's ENT clinic, following up with regard to her complaints of parotid gland enlargement.[19]  She was referred to the surgery department for a biopsy.

On May 25, 2012, the claimant followed up at UMC's family medicine center. The parotid swelling was described as suspicious for malignancy.[20]

On June 5, 2012 and again on June 7, 2012, the claimant was seen at UMC with regard to enlarged parotid glands.[21]

The disability report presumably prepared at the time of the claimant's June 2012 applications for benefits indicates that an interview was conducted face-to-face

---

[16]     Rec. Doc. 7-1 at 379.

[17]     Rec. Doc. 7-1 at 387.

[18]     Rec. Doc. 7-1 at 364-370.

[19]     Rec. Doc. 7-1 at 378.

[20]     Rec. Doc. 7-1 at 356-358.

[21]     Rec. Doc. 7-1 at 349-350, 353

with the claimant.  She was described as "very slow when walking" and very thin, and she "had trouble talking and answering the questions due to her condition."[22]

The claimant was admitted to UMC on June 13, 2012 and discharged on July 5, 2012, a twenty-three day hospitalization.[23]  The previous day, she had presented at the hospital's emergency room, complaining of a sore throat and painful swallowing as well as weakness, nausea, decreased appetite, and loss of weight.  The initial diagnoses were hypoxemia, dehydration, malnutrition, anemia, dysphagia, and lower extremity weakness.  It was determined that she also had neurological deficits in certain cranial nerves.  On June 15, 2012, a neurologist consulted on her case and reached a working diagnosis of acute inflammation demyelinating polyneuropathy secondary to sarcoidosis.  On June 15, she underwent mediastinoscopy with biopsy, which showed granulomatous inflammation of the lymph nodes.  Because tuberculosis could not be ruled out, treatment was started.  At some point, the claimant went into respiratory failure and was intubated.  She was moved to the intensive care unit on June 18.  After being intubated for three days, a tracheotomy was performed.[24]  There were complications from both the mediastinoscopy and the

---

[22]     Rec. Doc. 7-1 at 149.

[23]     Rec. Doc. 7-1 at 248-282.

[24]     "Tracheostomy (tray-key-OS-tuh-me) is a surgically created hole through the front of your neck and into your windpipe (trachea).  The term for the surgical procedure to create this

tracheotomy.  Due to neurological deficits and cranial nerve palsy, she was diagnosed with neurosarcoidosis.  The claimant developed a staph infection, which was treated. She was given physiotherapy in an effort to regain strength in her upper and lower extremities.  On June 19, a chest x-ray detected pneumonia.[25]  On June 21, a percutaneous endoscopic gastrostomy ("PEG") feeding tube was surgically inserted due to her inability to tolerate secretions and her difficulty in swallowing.  On June 25, a surgical procedure was required to remedy bleeding from the tracheostomy site.[26]  Upon discharge home on July 5, 2012, her diagnoses were neurosarcoidosis, diabetes mellitus, and hypertension.  There is a reference in the records to a history of throat cancer,[27] but no diagnosis of throat cancer was found in the records for this hospitalization or at any other place in the record.

The claimant was again hospitalized at UMC from July 9 to July 12, 2012.[28] She had been seen in the emergency room at Opelousas General Hospital, and was transferred to the ER at UMC by ambulance.  Her blood sugar was extremely low.

---

opening is tracheotomy.  Mayo Clinic, http://www.mayoclinic.org/tests-procedures/tracheostomy/basics/definition/prc-20020545 (last visited August 3, 2016).

[25]     Rec. Doc. 7-1 at 286.

[26]     Rec. Doc. 7-1 at 403-404.

[27]     Rec. Doc. 7-1 at 274.

[28]     Rec. Doc. 7-1 at 322-336.

She was unresponsive when first seen in Opelousas, then became agitated.  She was removed from her insulin regimen, medicated, and slowly regained consciousness and stability.  Upon discharge, she was prescribed NovoLog and Lantus for her diabetes, Prednisone for the neurosarcoidosis, Coreg and Benazepril for hypertension, and Celexa for depression.  She was able to have liquids and semisolid food orally as well as receiving nutrition through the PEG tube.  Her discharge diagnoses were altered mental status secondary to hypoglycemia, resolved; neurosarcoidosis; hypertension; and diabetes mellitus.

On July 24, 2012, the claimant was seen for a follow up visit, and significant improvement was noted.[29]

On July 26, 2012, the claimant was seen at the ENT clinic at UMC in follow-up to her hospitalization.[30]  It was noted that her cranial nerve paresis was improving.

On August 16, 2012, the claimant was again seen at UMC's ENT clinic in follow up.[31]  She then visited UMC's internal medicine clinic on September 7, 2012,[32] complaining of hand and knee pain as well as a bothersome cough.

---

[29]    Rec. Doc. 7-1 at 343-344.

[30]    Rec. Doc. 7-1 at 283.

[31]    Rec. Doc. 7-1 at 479.

[32]    Rec. Doc. 7-1 at 481-484.

On September 18, 2012, the claimant's medications included Novolog Flexpen and Novolog, Carvedilol, aspirin, Prednisone, Citalopram, Benazepril.[33]

On September 28, 2012,[34] Single Decision Maker Jennifer Spring noted that she spoke with the claimant, who "had a difficult time talking and seemed to have to gasp for air prior to speaking."  The claimant "had a difficult time talking and had to take a gasping deep breath with every word or two."  Additionally, the claimant "had a difficult time talking, coughed, and was wheezing extremely loud.  So loud that when she did I had to hold the phone away from my ear.  I then spoke with  her sister. . . and I could hear her wheezing loudly in the background.  She is still ambulating with a walker."

On October 20, 2012, the claimant was examined by Michael A. Hall, M.D. at the request of Disability Determination Services.[35]  She told Dr. Hall that she had been diagnosed with throat cancer about four months earlier, that she supplements her diet by means of the feeding tube, that she was diagnosed with diabetes about three to four years earlier, and that she was diagnosed with arthritis within the past year. Dr. Hall found that the claimant had no trouble getting on or off the examination table

---

[33]     Rec. Doc. 7-1 at 200.

[34]     Rec. Doc. 7-1 at 51.

[35]     Rec. Doc. 7-1 at 491-493.

or dressing or undressing herself.  While her speech was slightly muffled due to the tracheostomy, he noted that her speech was 95% understandable.  He found that she had a normal range of motion, could walk on her heels and toes, could squat, and did not require an assistive device even though the she had entered the examination room with a walker.  He found that the claimant's strength was normal in her upper and lower extremities, and there was no muscle atrophy.  He found that her cranial nerves were grossly intact and her deep tendon reflexes were normal.  Dr. Hall found no evidence of a decrease in functionality due to her alleged arthritis and no end organ damage secondary to her diabetes or her alleged throat cancer.  In his medical opinion, she did not need an assistive device, and he placed no limitations on her.

On November 15, 2012, the claimant was seen at UMC's ENT clinic.[36]  It was noted that she was doing well.  However, the doctor referred the claimant to the speech department for a PMV.  The term "PMV" refers to a Passy-Muir valve, which is used to help people with tracheostomies speak more normally.[37]  It was also noted that her blood sugar numbers were running too high.

---

[36]     Rec. Doc. 7-1 at 513.

[37]     Johns Hopkins Medicine, http://www.hopkinsmedicine.org/tracheostomy/living/passey-muir_valve.html (last visited June 21, 2016).

On January 23, 2013, the claimant was seen in the emergency room at UMC because her feeding tube came out and she was requesting a replacement.[38]

On January 29, 2013, the claimant was again seen at UMC.[39]  She was being referred to the surgery department for removal of her PEG tube.

On April 30, 2013, the claimant again followed-up at the UMC clinic for tracheostomy care.[40]  She had no complaints and was voicing well.  It was noted that she was still using the PEG tube.

On October 17, 2013, the claimant was again seen at UMC's ENT clinic.[41]  She was noted to be currently without complaints.

On November 6, 2013, the claimant was again seen at UMC.[42]  Her neurosarcoidosis was described as controlled.  She still had the tracheostomy and the PEG tube even though it was noted that she is able to eat.  The doctor noted that she was doing well and had no new complaints.

---

[38]     Rec. Doc. 7-1 at 511-512.

[39]     Rec. Doc. 7-1 at 514-515.

[40]     Rec. Doc. 7-1 at 510.

[41]     Rec. Doc. 7-1 at 505.

[42]     Rec. Doc. 7-1 at 501-503.

The claimant presented at the ENT clinic at UMC on January 21, 2014 for follow-up care with regard to her tracheostomy.[43]  It was noted that she still had weakness in certain cranial nerves.  However, capping trials were to begin and the claimant was to return to discuss decannulation if the capping went well. "Decannulation" is the process of removing a tracheostomy when it is no longer needed.[44]  The record does not indicate whether the PEG tube was still in place.

At the hearing on February 5, 2014, the claimant testified that she still had both the tracheostomy and the PEG tube.[45]  She also had a port for the administration of medication.[46]  She testified that home health care nurses were going to her residence twice a day to assist her with hygiene, medication, and feeding through the PEG tube.[47]  She also testified that she was receiving mental health treatment from "some nurses."[48]  The ALJ had difficulty hearing what the claimant said.[49]  The claimant

---

[43]     Rec. Doc. 7-1 at 499.

[44]     Johns Hopkins Medicine, http://www.hopkinsmedicine.org/tracheostomy/living/ decannulation.html (last viewed June 21, 2016).

[45]     Rec. Doc. 7-1 at 39, 40.

[46]     Rec. Doc. 7-1 at 39.

[47]     Rec. Doc. 7-1 at 39-40.

[48]     Rec. Doc. 7-1 at 37.

[49]     Rec. Doc. 7-1 at 36, 37.

testified that some of her medication is helpful, but some makes her dizzy and causes her to pass out.[50]  She stated that there are times when she cannot walk.[51]  She said she does not do any laundry, shopping, or housework,[52] all of which was done for her by her sister, and she stated that she was unable to eat solid food or to bathe herself.[53]

**ANALYSIS**

## A.   STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[54]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[55]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be

---

[50]      Rec. Doc. 7-1 at 36.

[51]      Rec. Doc. 7-1 at 37.

[52]      Rec. Doc. 7-1 at 37-38.

[53]      Rec. Doc. 7-1 at 40.

[54]      *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[55]      *Villa v. Sullivan*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

-12-

established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[56]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[57]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[58]  Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts.[59]  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[60]

---

[56]    *Hames v. Heckler*, 707 F.2d at 164 (quoting *Hemphill v. Weinberger*, 483 F.2d 1137. 1139 (5th Cir. 1973), and *Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973)).

[57]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

[58]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1021; *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Carey v. Apfel*, 230 F.3d at 135; *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001).

[59]    *Martinez v. Chater*, 64 F.3d at 174.

[60]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991); *Martinez v. Chater*, 64 F.3d at 174.

-13-

B.   **ENTITLEMENT TO BENEFITS**

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[61]

Every individual who meets certain income and resource requirements, has filed an application for benefits, and is determined to be disabled is eligible to receive Supplemental Security Income ("SSI") benefits.[62]

The ALJ found that the claimant does not meet the insured status requirements for purposes of entitlement to disability insurance cash benefits, but she does meet the special insured requirements for Medicare purposes through December 31, 2016, based on her Medicare qualified government employment.  This is not contested.

The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[63]  A claimant shall be determined to be disabled only if his physical or mental impairment

---

[61]     See 42 U.S.C. § 423(a).

[62]     42 U.S.C. § 1382(a)(1) & (2).

[63]     42 U.S.C. § 1382c(a)(3)(A).

-14-

or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[64]

## C.   EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  This process requires an ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work done in the past; and (5) can perform any other work.[65] "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[66]

---

[64]     42 U.S.C. § 1382c(a)(3)(B).

[65]     20 C.F.R. § 404.1520; see, e.g., *Wren v. Sullivan*, 925 F.2d at 125; *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

[66]     *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[67] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[68]   The claimant's residual functional capacity is used at the fourth step to determine whether he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[69]

The claimant bears the burden of proof on the first four steps.[70]   At the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[71]   This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[72]   If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to

---

[67]     20 C.F.R. § 404.1520(a)(4).

[68]     20 C.F.R. § 404.1545(a)(1).

[69]     20 C.F.R. § 404.1520(e).

[70]     *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[71]     *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[72]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

rebut this finding.[73]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[74]

## D.   THE ALJ'S FINDINGS AND CONCLUSIONS

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since April 2012.[75]  This finding is supported by the evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  neurosarcoidosis and diabetes mellitus II.[76]  This finding is supported by evidence in the record.   The claimant argues that her dependence on a tracheostomy and feeding tube are additional severe impairments that should have been recognized by the ALJ.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[77]  The claimant challenges this finding.

---

[73]   *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[74]   *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992), citing *Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir. 1988).  See, also, 20 C.F.R. § 404.1520(a)(4).

[75]   Rec. Doc. 7-1 at 21-22.

[76]   Rec. Doc. 7-1 at 22.

[77]   Rec. Doc. 7-1 at 22.

The ALJ found that the claimant has the residual functional capacity to perform work at the sedentary level in a climate controlled environment with the option to change positions every thirty minutes.[78]  The claimant challenges this finding.

At step four, the ALJ found that the claimant is not capable of performing her past relevant work.[79]

At step five, the ALJ found that the claimant was not disabled from February 1, 2012 through February 28, 2014 (the date of the decision) because there are jobs in the national economy that she can perform.[80]  The claimant challenges this finding.

## E.   THE ALLEGATIONS OF ERROR

The claimant contends that the ALJ erred (1) by failing to find that the claimant's dependence on a tracheostomy and feeding tube are severe impairments, (2) by improperly evaluating whether the claimant meets or medically equals a listing, (3) by improperly evaluating the lay witness testimony, third-party evidence, and non-medical evidence, and (4) by improperly evaluating the claimant's residual functional capacity and credibility in failing to consider the functional limitations imposed by her tracheostomy and PEG tube.

---

[78]    Rec. Doc. 7-1 at 22.

[79]    Rec. Doc. 7-1 at 25.

[80]    Rec. Doc. 7-1 at 26-27.

**F.   THE ALJ ERRED IN EVALUATING THE SEVERITY OF THE CLAIMANT'S IMPAIRMENTS**

Whether a claimant's medical condition qualifies as a "severe impairment" is evaluated at step two of the sequential analysis.   The Commissioner issued regulations defining a "severe impairment" as one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."[81]   The Fifth Circuit, however, has held that a literal application of that definition is inconsistent with the statutory language and legislative history of the Social Security Act.[82]   Therefore, the Fifth Circuit established the following standard for determining whether a claimant's impairment is severe:   an impairment is not severe only when it is a "slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education[,] or work experience."[83]   The claimant argues that, under this standard, the ALJ should have found that her tracheostomy and her feeding tube are severe impairments.

---

[81]     20 C.F.R. §§ 404.1520(c), 416.920(c), 404.1521 ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.").

[82]     *Stone v. Heckler*, 752 F.2d 1099, 1104–05 (5th Cir. 1985).

[83]     *Stone v. Heckler*, 752 F.2d at 1101.

The record demonstrates that the claimant's sarcoidosis affected her cranial nerves and resulted in the need for a tracheostomy to assist her breathing and a feeding tube to assist her eating.  The ALJ found that the claimant's neurosarcoidosis is a severe impairment.  The claimant argues that the tracheostomy and feeding tube cause functional limitations separate and apart from those caused by the disease itself because they have more than a minimal affect on her ability to work.  Due to the tracheostomy, the claimant has significant difficulty talking for any duration and has trouble being understood.  When Single Decision Maker Jennifer Spring interviewed the claimant in August 2012, she noted that the claimant "had a difficult time talking and seemed to have to gasp for air prior to speaking."[84]  When Ms. Spring again interviewed the claimant in September 2012, she similarly noted that the claimant "had a difficult time talking and had to take a gasping deep breath with every word or two when she spoke. . . . She had a difficult time talking, coughed, and was wheezing extremely loud.  So loud that when she did I had to hold the phone away from my ear.  I then spoke with her sister. . . and I could hear her wheezing loudly in the background."[85]  When Dr. Hall examined the claimant less than a month later, in October 2012, he noted that the claimant's "speech was slightly muffled secondary

---

[84]      Rec. Doc. 7-1 at 61.

[85]      Rec. Doc. 7-1 at 61.

to placement of the tracheostomy, but was noted to be approximately 95% understandable."[86]   The ALJ gave Dr. Hall's opinions little weight because the evidence at the hearing showed the claimant to be more limited than determined by Dr. Hall.[87]   The ALJ did not specifically state, however, whether Dr. Hall's opinion about the claimant's ability to communicate orally was the basis for discounting his opinions.   During the brief hearing in February 2014, the claimant remained difficult to understand.   The ALJ noted four times that she had difficulty hearing what the claimant was saying.[88]   Both a tracheostomy and a feeding tube are drastic medical procedures that require regular maintenance.   The record reflects clinic visits for tracheostomy care, including but not limited to a referral for the implantation of a device to help her speak more normally[89] and a required replacement of the feeding tube.[90]   Following a careful reading of the ALJ's decision, this Court finds that the ALJ should have determined whether the tracheostomy and the feeding tube constitute severe impairments.   This error also impacts the validity of the ALJ's evaluation of the claimant's residual functional capacity since every impairment of

---

[86]     Rec. Doc. 7-1 at 492.

[87]     Rec. Doc. 7-1 at 24.

[88]     Rec. Doc. 7-1 at 36, 37.

[89]     Rec. Doc. 7-1 at 513.

[90]     Rec. Doc. 7-1 at 511-512.

a claimant – whether severe or not – should be considered in determining residual functional capacity.

This Court finds that the ALJ's decision at step two of the sequential analysis was not reached through the application of proper legal standards, and the undersigned is unable to determine whether the Commissioner's conclusion at step two is or is not based on substantial evidence.  Consequently, remand of this matter is required.

## G.   THE ALJ ERRED IN EVALUATING WHETHER THE CLAIMANT'S IMPAIRMENTS MEET OR MEDICALLY EQUAL A LISTING

The ALJ found that the claimant does not have an impairment or a combination of impairments that meets or medically equals the severity of a listed impairment.  An "ALJ is required to discuss the evidence and explain the basis for his findings at each unfavorable step of the sequential evaluation process."[91]  More particularly, "[t]he ALJ should identify the listed impairment for which the claimant's symptoms fail to qualify and provide an explanation as to how he or she determined that the symptoms are insufficiently severe to meet any listed impairment."[92]

_____

[91]     *Williams v. Astrue*, No. 09-0130, 2010 WL 989216, at * 3 (W.D. La. Mar. 15, 2010), citing *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007), which in turn cites 42 U.S.C. § 405(b)(1).

[92]     *Savoie v. Colvin*, No. 14-30-JJB-RLB, 2015 WL 1004217, at *5 (M.D. La. Mar. 5, 2015).

In *Audler v. Astrue*, the ALJ, at step three of the analysis, summarily concluded that the medical evidence in the record indicated that the claimant had impairments that were severe but not severe enough to meet or medically equal a listed impairment.  The Fifth Circuit Court of Appeals noted that "[t]he ALJ did not identify the listed impairment for which Audler's symptoms fail to qualify, nor did she provide any explanation as to how she reached the conclusion that Audler's symptoms are insufficiently severe to meet any listed impairment."[93]  The Fifth Circuit concluded that "[s]uch a bare conclusion is beyond meaningful judicial review."[94]  The court then went on to explain that:

> By the explicit terms of the statute [42 U.S.C. § 405(b)(1)], the ALJ was required to discuss the evidence offered in support of Audler's claim for disability and to explain why she found Audler not to be disabled at that step.  Although the ALJ is not always required to do an exhaustive point-by-point discussion, in this case, the ALJ offered nothing to support her conclusion at this step and because she did not, "we, as a reviewing court, simply cannot tell whether her decision is based on substantial evidence or not."[95]

---

[93]     *Audler v. Astrue*, 501 F.3d at 448.

[94]     *Audler v. Astrue,* 501 F.3d at 448 (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996)).

[95]     *Audler v. Astrue*, 501 F.3d at 448 (quoting *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986)).

In this case, the ALJ failed to follow the Fifth Circuit's guidelines in evaluating the claimant's impairments, summarily stating that "the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairment. . . ."[96]  The state agency evaluators considered three potentially implicated listings – 11.04 regarding central nervous system vascular accidents, 11.08 concerning spinal cord or nerve root lesions due to any cause, and 12.04 concerning affective disorders[97] – and the claimant's counsel argued in a pre-hearing brief that the claimant meets or equals the same three listings identified by the state agency evaluators.[98]  But the ALJ did not mention those listings – or any other listings – in her ruling.   In order to determine whether the claimant's impairments meet or equal a listing, however, the ALJ should have identified the relevant listings and then she should have compared the claimant's symptoms and her physicians' medical findings against the criteria for those listings.   In this case, however, the ALJ did not mention any listings, explain what listings she considered, or explain how she reached the conclusion that the claimant does not meet or equal them.     Therefore,   in   accordance   with   the   Fifth   Circuit's   reasoning,   the

---

[96]     Rec. Doc. 7-1 at 22.

[97]     Rec. Doc. 7-1 at 53, 63, 64.

[98]     Rec. Doc. 7-1 at 220.

Commissioner's step three determination in this case was not reached through the application of proper legal standards and the undersigned is unable to determine whether the Commissioner's conclusion at step three is or is not based on substantial evidence.  Consequently, remand is required.[99]   Accordingly, this matter will be remanded for a thorough analysis of whether the claimant has an impairment or combination of impairments that meets or medically equals a listed impairment.

## H.   THE ALJ DID NOT ERR IN EVALUATING NON-MEDICAL EVIDENCE

An ALJ is required to evaluate all relevant evidence, including the testimony from non-medical sources.[100]   The ALJ's ruling failed to expressly evaluate the observations by K. Brooks in a disability report, by single decision maker Jennifer Spring in her disability analysis, and by the claimant's sister in a function report. These persons' observations are relevant to the severity of the impairments resulting from the claimant's medical conditions, her tracheostomy, and her feeding tube; relevant to the claimant's residual functional capacity; and relevant to the claimant's

---

[99]   See, e.g., *Reyna v. Colvin*, No. 5:14-CV-147-C, 2015 WL 1515251, at *4 (N.D. Tex. Apr. 1, 2015); *Marsh v. Comm'r of Soc. Sec. Admin.*, No. 4:13CV312, 2015 WL 1288656, at *3 (E.D. Tex. Mar. 20, 2015) *Watson v. Colvin*, No. 3:13-CV-583-BF, 2014 WL 1281473, at *4 (N.D. Tex. Mar. 31, 2014); *Joseph v. Astrue*, No. 6:10-CV-01315, 2012 WL 601477, at *6 n. 74 (W.D. La. Jan. 24, 2012) report and recommendation adopted, No. 6:10-CV-01315, 2012 WL 601586 (W.D. La. Feb. 22, 2012); *Robertson v. Astrue*, No. 3-10-CV-1669-BD, 2011 WL 3836915, at *4 (N.D. Tex. Aug. 26, 2011); *Lynch v. Astrue*, No. 7–10–CV–0032–BD, 2011 WL 1542056 at *3–4 (N.D.Tex. Apr.22, 2011).

[100]   20 C.F.R. § 404.1513(d)(4).

credibility.  However, an ALJ is not required to mention every piece of evidence relied upon in making his decision.  Accordingly, this Court cannot conclude that the ALJ's failure to specifically mention each of these persons' observations in her ruling was error that requires remand of the ALJ's ruling.  However, this matter will be remanded on other bases, and the Commissioner will be reminded that all evidence – whether medical or non-medical in nature – must be considered in deciding whether the claimant is or is not disabled.

I.   **THE ALJ ERRED IN EVALUATING THE CLAIMANT'S RESIDUAL FUNCTIONAL CAPACITY**

As noted above, this Court finds that the ALJ erred in failing to consider whether the claimant' tracheostomy and feeding tube are severe impairments and further finds that this error resulted in an incomplete evaluation of the claimant's residual functional capacity.  There is substantial evidence in the record establishing that the tracheostomy affects the claimant's ability to communicate.  The severity of the communication impairment was not expressly considered by the ALJ in making her residual functional capacity finding.  Accordingly, this Court finds that the residual functional capacity finding is flawed and should be reevaluated on remand.

**J.**    **DEFERENCE IS AFFORDED TO THE ALJ'S CREDIBILITY EVALUATION**

The ALJ found the claimant to lack credibility, particularly with regard to the nursing care that she claimed in her hearing testimony to receive.  Still, the evidence presented at the hearing was sufficient for the ALJ to find that the claimant was more limited than determined by consultants Dr. Hall and Dr. Bishnoi.[101]   Credibility determinations by an ALJ are entitled to deference.[102]   The ALJ is in the best position to assess a claimant's credibility because he "enjoys the benefit of perceiving first-hand the claimant at the hearing."[103]   The ALJ is correct in this case that there is no medical evidence in the record corroborating the claimant's statement that she receives home-based nursing care or requires the use of a walker to ambulate.  This Court is, therefore, unwilling to second guess the ALJ's credibility determinations.

**CONCLUSION**

As fully explained above, this Court finds that the ALJ failed to apply the proper legal standards at steps two and three of the evaluative process and when analyzing the claimant's residual functional capacity.  Due to those errors, this Court cannot determine whether the ALJ's findings at step two, step three, and with regard

---

[101]    Rec. Doc. 7-1 at 24.

[102]    See *Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991).

[103]    *Falco v. Shalala*, 27 F.3d 160, 164 n.18 (5th Cir. 1994).

to the claimant's residual functional capacity are supported by substantial evidence. Accordingly,

IT IS ORDERED that the Commissioner's decision is REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to (1) determine whether the claimant's dependence upon a tracheostomy and feeding tube are severe impairments, (2) determine whether the claimant's impairments – alone or in combination – meet or equal a listed impairment, and (3) again evaluate the claimant's residual functional capacity in light of all of the evidence – medical and nonmedical – in the record.

Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[104]

Signed in Lafayette, Louisiana, this 8th day of August 2016.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[104]    See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir.1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

-28-